UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**4 WEST LLC**
1902 Campus Place
Suite 9
Louisville, Kentucky 40299

and

**ROBERT E. HULL**
1320 N. Beckley Station Rd.
Louisville, KY 40245

Plaintiffs,

v.

**AUTO-OWNERS (MUTUAL)
INSURANCE COMPANY**
6101 Anacapri Boulevard
Lansing, Michigan 48917-3999

Defendant.

Case No. 3:22 cv 059

WALTER H. RICE

**COMPLAINT WITH JURY DEMAND**



Plaintiffs 4 West LLC ("4 West") and Robert E. Hull ("Hull"), individually and as sole member of 4 West LLC for their Complaint against Defendant Auto-Owners (Mutual) Insurance Company ("Auto-Owners"), and pursuant to OH. Civ. R. 41(A)(1) hereby states as follows:

### THE PARTIES

1. 4 West is a limited liability company duly organized and existing under the laws of the State of Kentucky and having its principal place of business in Louisville, Kentucky.

2. 4 West's sole member is Robert E. Hull ("Mr. Hull"), who is a resident of Louisville, Kentucky.

3. Upon information and belief, Auto-Owners is licensed to do business in Ohio and maintains its principal place of business in Lansing, Michigan.

## JURISDICTION AND VENUE

4. The matter in controversy is between citizens of different states.

5. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs.

6. Jurisdiction exists under 28 U.S.C. § 1332.

7. A substantial part of the events and omissions giving rise to the claim arose in this district.

8. Auto-Owners is subject to personal jurisdiction in this district.

9. Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391.

10. Venue is proper in the Western Division of the Southern District of Ohio pursuant to the local rules.

## FACTS

11. This is an action for breach of contract, breach of fiduciary duty, declaratory judgment, and bad faith. 4 West seeks compensatory damages as well as a declaration of Auto-Owners' legal obligations arising out of a Tailored Protection Insurance Policy ("Policy") Auto-Owners issued to 4 West, Policy No. 164603-05964417-17, for the policy period December 20, 2017 to December 20, 2018. A copy of the Policy is attached as Exhibit A.

12. The Policy provided commercial property coverage for the premises located at 4 W. Main Street, Springfield, Ohio 45502-1300 ("Premises").

13. In relevant part, the Policy states as follows:

    **A.    COVERAGE**

        We will pay for direct physical loss of or damage to Covered Property at the premises in the Declarations caused by or resulting from any Covered Cause of Loss.

1. **Covered Property**

    Covered property, as used in this Coverage Part, means the type of property described in Section **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

    a. **Building**, meaning the building or structure described in the Declarations,

    …

3. **Covered Cause Of Loss**

    See applicable Causes of Loss Form as Shown in the Declarations.[1]

    …

G. **OPTIONAL COVERAGE**

    If shown as applicable in the Declarations, the following Optional Coverage apply separately to each item.

    …

    3. **Replacement Cost**

        a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

        …

**EQUIPMENT BREAKDOWN ENDORSEMENT**

1. The **Building and Personal Property Coverage Form** is amended as follows:

    a. Under **A. COVERAGE**, the following is added: We will pay for "Equipment Breakdown" in any one occurrence at any one location where "Equipment Breakdown" is shown in the Declarations.

        …

    b. Under **A. COVERAGE, 4. Additional Coverage** is amended as follows:

        …

        (4) The following is added to **5. Coverage Extensions**:

---

[1] The Policy includes the "CAUSES OF LOSS – SPECIAL FORM," which states in pertinent part that "[W]hen Special is shown in the Declarations, Covered Cause of Loss means Risk of Direct Physical Loss…."

**Replacement Cost Coverage**

We will pay you the amount you actually spend to repair or replace your damaged property with new property of like kind, capacity, size and quality, whichever is less except for the following:

If any damaged property is not repaired or replaced, then we will only pay the actual cash value at the time of the "Equipment Breakdown".

...

3. **DEFINITIONS** are amended as follows as they apply to this endorsement only:

    a. The **CAUSES OF LOSS – SPECIAL FORM**, "Specified Causes of Loss" is amended to include "Equipment Breakdown".

    b. Under **CAUSES OF LOSS – SPECIAL FORM**…, the following definitions are added:

"Equipment Breakdown" means:

    (1) Physical loss or damage both originating within:

        (a) Boilers,
        (b) …; and

...

    (2) Caused by, resulting from, or consisting of:

        (a) Mechanical Breakdown;….

14. On or about January 4, 2018, the Premises was damaged as a result of a boiler system mechanical failure.

15. Upon information and belief, hydronic heating lines on the second and fifth floors of the Premises failed, discharging water that damaged several floors, including without limitation, the bank vault located on the lower portion of the Premises ("Vault").

16. The water damage to the Premises was extensive, including without limitation, damage to walls, flooring, carpeting, ceilings, fixtures, and personal property.

17. The water discharge caused oxidation and rust on the wire cords in the elevator shaft.

18. The water discharge caused oxidation and rust on all surfaces of the Vault.

19. The water damage to the Premises occurred despite 4 West's taking immediate and reasonable measures to preserve the Premises, including without limitation, extracting water from the Premises and completing piping repairs.

20. 4 West immediately notified Auto-Owners of the damage to the Premises ("Claim").

21. On or about January 9, 2018, Auto-Owners representative Sidney Guyton ("Ms. Guyton") conducted a visual inspection of the Premises with Mr. Hull.

22. During the January 9, 2018 inspection, Ms. Guyton told 4 West that Auto-Owners needed to determine if its reinsurer, Mutual Boiler RE ("Mutual Boiler"), would be covering the Claim and Ms. Guyton instructed 4 West to obtain estimates for water mitigation.

23. Between January 11, 2018 and January 26, 2018, 4 West contacted over fourteen (14) water restoration vendors but only two had availability to do the work and only one of those, Total Restoration Solutions, LLC ("Total Restoration"), provided a January 26, 2018 estimate ("Total Restoration Estimate").

24. The Total Restoration Estimate said that Total Restoration could begin work within a week if it received a 50% deposit.

25. On or about January 29, 2018, 4 West provided the Total Restoration Estimate to Auto-Owners and informed Auto-Owners that Total Restoration could start remediation work in a week if it received the 50% deposit. Ms. Guyton said that Auto-Owners was still waiting to hear from Mutual Boiler on coverage.

26. By February 5, 2018, over a month after 4 West submitted the Claim, Auto-Owners still had not substantively responded by either allowing or denying the Claim.

27. On or about February 5, 2018, given Auto-Owners' delay and lack of substantive response, 4 West began the water mitigation process.

28. Between February 5, 2018 and March 15, 2018, 4 West expended significant sums to mitigate the resulting water damage, including without limitation, purchasing over 100 blowers and dehumidifiers, removing carpeting and associated padding, removing floor tiles, and removing ceiling tiles.

29. On or about March 15, 2018, 4 West sent Auto-Owners invoices for amounts expended to restore the Premises, utility bills, and re-forwarded the Total Restoration Estimate.

30. Several days later, Ms. Guyton conducted a second visual inspection of the Premises ("Second Inspection").

31. During the Second Inspection, a representative from Service Master realized that some of the damaged flooring of the Premises might contain asbestos.

32. In April 2018, Ms. Guyton conducted a third visual inspection of the Premises ("Third Inspection").

33. During the Third Inspection, a representative from Encheck (an environmental consultant) inspected the Premises to determine the possible need for asbestos abatement.

34. Encheck returned several times in April 2018 for follow-up inspections.

35. In June 2018, 4 West sent Ms. Guyton invoices and receipts totaling $192,930.54 for repairs to the Premises ("June Invoices").

36. Of the June Invoices, Auto-Owners only paid 4 West $72,089.00, leaving a balance owed of $120,841.54.

37. On or about July 13, 2018, Auto-Owners sent 4 West another check in the amount of $9,108.00.

38. In July 2018, Service Master provided Auto-Owners with a quote of $145,300.00 to perform full asbestos abatement.

39. Rather than moving forward with the asbestos abatement, Auto-Owners said it wanted to obtain additional quotes.

40. On or about August 3, 2018, Auto-Owners sent 4 West a check in the amount of $29,351.09 purportedly in full payment of a May 31, 2018 invoice from 4 West in the amount of $59,040.00.

41. 4 West contacted Auto-Owners about the fact that the checks from Auto-Owners did not cover the full amount of the invoices; 4 West received no response.

42. On or about August 9, 2018, North American Environmental Services, L.L.C. ("North American") provided Auto-Owners an asbestos abatement estimate in the amount of $99,626.00 ("North American Estimate").

43. The North American Estimate did not include fees for Encheck, or any other environmental consultant, to monitor work and conduct air tests to ensure the safety of tenants at the Premises.

44. Despite the safety risks associated with choosing North American to conduct asbestos abatement, on or about August 17, 2018, Auto-Owners informed 4 West that 4 West could select whomever it wanted to conduct the asbestos abatement, but that Auto-Owners would only pay the amount quoted in the North American Estimate of $99,626.00.

45. In November 2018, having not heard from Auto-Owners in weeks, 4 West contacted Auto-Owners about Auto-Owners paying for remaining repairs to the Premises.

46. Auto-Owners responded that it would need a sworn proof of loss from 4 West and that Auto-Owners would need to conduct a fourth visual inspection of the Premises.

47. On or about December 11, 2018, Auto-Owners sent 4 West a sworn statement of loss form along with a reservation of rights letter.

48. On or about January 10, 2019, 4 West returned the sworn statement of loss to Auto-Owners.

49. On or about January 10, 2019, 4 West again inquired as to why the invoices previously submitted to Auto-Owners had not been paid in full.

50. On or about February 6, 2019, Auto-Owners asked about scheduling yet another inspection of the Premises; 4 West responded that it wished to resolve the unpaid invoices prior to scheduling another inspection.

51. On or about February 12, 2019, Auto-Owners offered to pay 4 West $94,041.66 on the unpaid invoices instead of the $150,530.45 owed.

52. On April 29, 2019, Auto-Owners requested another inspection of the Premises and asked for a water mitigation estimate.

53. In response to the April 29, 2019 inquiry, 4 West reminded Auto-Owners that 4 West provided the Total Restoration Estimate to Auto-Owners in January 2018, that this was the only estimate Auto-Owners ever requested, and that the outstanding amounts for repairs to the Premises were still unpaid.

54. In or about June 2019, despite Auto-Owners not requesting the same, 4 West began obtaining estimates to complete additional mitigation and restoration work to the Premises, including without limitation, estimates for demolition, reconstruction, and painting.

55. On or about August 15, 2019, 4 West provided Auto-Owners the estimates for additional mitigation, demolition, and reconstruction work.

56. Another visual inspection of the Premises was scheduled for August 28, 2019.

57. On or about August 16, 2019, American Metal Restoration provided a detailed repair estimate of $320,000.00 to refinish the Vault's metal surfaces and components.

58. On August 28, 2019, Ms. Guyton conducted another visual inspection of the Premises.

59. Nearly 20 months after the Claim was first submitted, Auto-Owners assured 4 West that Auto-Owners would provide a comprehensive estimate for the completion of additional repairs and restoration work.

60. On September 9, 2019, 4 West inquired as to the status of the Claim; Auto-Owners said it would have a repair estimate completed within a week and requested information on damages to 4 West's personal property.

61. 4 West provided the requested information and inquired as to the status of Auto-Owners paying outstanding amounts on the invoices 4 West submitted in 2018.

62. On September 17, 2019, 4 West provided Auto-Owners with additional bills for mitigation, demolition, and repairs to the Premises.

63. On September 17, 2019, Auto-Owners acknowledged receipt of the additional documentation, and said it was still working on a repair estimate for all remaining mitigation, demolition, and reconstruction as well as the personal property portion of the Claim.

64. On October 1, 2019, Auto-Owners sent 4 West a check in the amount of $406,217.84, along with a letter and the long-awaited repair estimate, stating that Auto-Owners was not responsible for any further damage to the Premises.

65. On or about October 28, 2019, Peak Elevator provided a detailed repair estimate of $50,626.00 to replace the wire cords associated with the elevator operation.

66. On or about October 29, 2019, 4 West sent Auto-Owners a letter explaining that the estimated costs for additional water mitigation, demolition, and reconstruction of the Premises following application of Auto-Owners' $406,217.84 payment totaled $2,056,644.90.

67. On or about November 2019, Auto-Owners sent Mr. Hull a letter requesting that Nederveld be permitted to inspect the Premises to determine whether the water mitigation process had an impact on the then condition of the Premises.

68. On November 18, 2019, Auto-Owners sent 4 West a letter stating – for the first time – that Auto-Owners was denying the Claim under the Equipment Breakdown Endorsement of the Policy, and that the cause of loss would instead be treated as a "pipe freeze."

69. On December 20, 2019, Auto-Owners sent 4 West a letter enclosing Nederveld's Report of December 6, 2019 and alleging that damage to the Vault and the elevator cables resulted from 4 West's failure to timely and adequately complete water mitigation.

70. Based on the Nederveld report, Auto-Owners concluded that it was not responsible for any additional damages to the Premises, which it claimed occurred because of 4 West's failure to protect the Premises from further damage after the initial water loss.

71. Auto-Owners' conclusion was illogical given that, upon information and belief, Auto-Owners had never reviewed, approved, or denied Total Restoration's January 2018 water mitigation estimate.

72. To date, Auto-Owners has paid $710,433.59 for repairs to the Premises.

73. Upon information and belief, the total damage to the Premises sustained as a direct and proximate result of the water discharge exceeds $2,428,999.76.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

74. Plaintiffs re allege and incorporate by reference every allegation of the foregoing paragraphs as if they were fully rewritten into this paragraph.

75. 4 West complied with all conditions precedent to coverage under the terms and conditions of the Policy, including without limitation, providing Auto-Owners with timely notice of the claim and providing it with all requested information and documentation.

76. By failing to pay 4 West for damages to the Premises in accordance with the intended terms and conditions of the Policy, Auto-Owners has breached its contract with 4 West.

77. Because of Auto-Owners' breach of contract, 4 West has sustained damages in an amount more than $75,000.00.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

78. Plaintiffs re-allege and incorporate by reference every allegation of the foregoing paragraphs as if they were fully rewritten into this paragraph.

79. By issuing the Policy to 4 West, and accepting premiums for it, Auto-Owners created a fiduciary relationship between itself and 4 West.

80. Auto-Owners has breached the fiduciary duties it owes to 4 West by the actions described above.

81. Because of Auto-Owners' breach of fiduciary duties, 4 West has sustained damages in an amount in excess of $75,000.00.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment)

82. Plaintiffs re allege and incorporate by reference every allegation of the foregoing paragraphs as if they were fully rewritten into this paragraph.

83. 4 West states that under the terms and conditions of the Policy, Auto-Owners has a contractual obligation to provide it with full coverage for all damages to the Premises, including without limitation, all repair and/or replacement costs associated with the Claim.

84. It is the position of Auto-Owners, however, that the Policy does not provide full coverage for the Claim.

85. Considering the parties' differing positions regarding 4 West's rights to coverage under the Policy, a justifiable controversy exists, and this Court should issue a declaration of rights and duties of the parties under the Policy with respect to the Claim.

### FOURTH CLAIM FOR RELIEF
(Bad Faith)

86. Plaintiffs re allege and incorporate by reference every allegation of the foregoing paragraphs as if they were fully rewritten into this paragraph.

87. Auto-Owners has acted without reasonable justification in failing to timely pay 4 West for all damages to the Premises associated with the Claim.

88. Auto-Owners has acted without reasonable justification in failing to timely handle and evaluate the Claim.

89. By failing to timely pay 4 West for all damages to the Premises associated with the Claim, Auto-Owners has acted in bad faith, and because of Auto-Owners' bad faith, 4 West has sustained damages in excess of $2,000,000.00.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief against Auto-Owners:

(i) Compensatory damages in an amount more than $75,000.00;

(ii) Punitive damages in the amount of $3,000,000.00;

-13-

(iii) A declaration that the Policy provides coverage for, and Auto-Owners is liable to pay for, all damages to the Premises associated with the Claim;

(iv) An award of all of its costs, disbursements and attorneys' fees in connection with the prosecution of this action; and

(v) All such other and further legal and equitable relief as this Court may deem just and proper.

Respectfully submitted,

/s/*Robert E. Hull*
Robert E. Hull
1320 N. Beckley Station Road
Louisville, KY 40245
(502) 817-3346 (telephone)
rhull@hulltrust.com

*Plaintiff, pro se*


## JURY DEMAND

4 West LLC and Robert E. Hull hereby request a jury trial on all issues so triable.

/s/Robert E. Hull
Robert E. Hull, pro se